IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE ELAINE MAURER, ) | Case No. 1:25-CV-413-PAB |
| ) | |
| Plaintiff, ) | JUDGE PAMELA A. BARKER |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | REUBEN J. SHEPERD |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

## I.    Introduction

Plaintiff, Christine Elaine Maurer, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Maurer's application for DIB be affirmed.

## II.    Procedural History

Maurer filed for DIB on October 12, 2022, alleging a disability onset date of April 27, 2022. (Tr. 171-72). The claims were denied initially and on reconsideration. (Tr. 85, 99). She then requested a hearing before an Administrative Law Judge. (Tr. 162-63). Maurer (represented by counsel) and a vocational expert ("VE") testified before the ALJ on April 8, 2024. (Tr. 164-

65). On April 24, 2024, the ALJ issued a written decision finding Maurer not disabled. (Tr. 14-31). The Appeals Council denied her request for review on January 8, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Maurer timely filed this action on March 3, 2025. (ECF Doc. 1).

**III. Evidence**

    **A. Personal, Educational, and Vocational Evidence**

Maurer was 50 years old on the alleged onset date, making her an individual closely approaching advanced age according to Agency regulations. (*See* Tr. 62). She graduated from high school. (*See* Tr. 63). In the past, she worked as a bartender. (Tr. 41).

    **B. Relevant Medical Evidence[1]**

On January 18, 2022, Maurer presented to Avita Health radiology for an X-ray of her left knee. (Tr. 340). The results revealed severe arthritic changes of the medial compartment, mild arthritic changes of the lateral compartment and patellofemoral joint, but no fractures, dislocations, subluxation, loose bodies, osteochondral lesions, or acute osseous abnormalities. (Tr. 341).

On February 28, 2022, Maurer returned to Avita Health for right shoulder pain. (Tr. 339). The results of the X-ray showed moderate arthritic changes to the acromioclavicular joint and evidence of impingement with tuberosity changes. (*Id.*). The results showed no fractures, subluxations, dislocations, arthritic changes of the glenohumeral joint, and no other osseous abnormalities. (*Id.*)

---

[1] Although Maurer is diagnosed with a mental health impairment (*see* ECF Doc. 8, p. 2), she does not raise any error with the ALJ's evaluation of this impairment. Instead, she raises error solely with respect to the ALJ's evaluation of physical limitations. (*Id.* at pp. 9-20). I therefore limit my review of the medical evidence only to these issues and deem any argument as to her mental health impairment waived. *See McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997).

2

Maurer presented for an MRI of her right shoulder on March 23, 2022. (Tr. 336). Findings showed: full-thickness retracted supraspinatus and infraspinatus tendon tears; subscapularis and teres minor reactive tendinopathy; interstitial edema and mild fatty infiltration of the infraspinatus muscle; interstitial edema of the supraspinatus and teres minor muscles; severe intra-articular tendinosis of the bicep tendon long head; fraying of the biceps labral anchor; and large glenohumeral joint effusion freely communicated with the subacromial-subdeltoid bursal space. (Tr. 337).

After conservative treatment failed, Maurer presented for a follow up appointment to discuss surgical options with Dr. Kyle L. Randall, M.D., on April 12, 2022. (Tr. 478). She endorsed severe pain throughout her entire right shoulder, which prevented her from sleeping throughout the night and performing her day-to-day activities. (*Id.*). A right shoulder exam revealed no swelling, atrophy or deformity. (Tr. 481). Her range of motion was limited to 80 degrees forward flexion and abduction, L4 internal rotation, and 60 degrees of external rotation. (*Id.*). Her supraspinatus strength measured 4-/5, but 5/5 for both external and internal rotation strength. (*Id.*). The exam further revealed biceps and acromioclavicular tenderness and positive results for Hawkin's, Neer's, Speed's, and Yergason's tests. (*Id.*). Crossbody adduction was also positive. (*Id.*). Her ultimate diagnoses were (1) tear of right rotator cuff, unspecified tear extent, unspecified whether traumatic; (2) impingement syndrome of right shoulder; (3) biceps tendonitis on right; and (4) arthritis of right acromioclavicular joint. (Tr. 482).

On April 20, 2022, Maurer presented for pre-operative education with Kristin Schaber, OT, for her upcoming surgery. (Tr. 474). She reported that her injury occurred over time, but that she suffered ongoing pain for approximately one year, with symptoms increasing in the previous four months. (*Id.*).

After being cleared for surgery by James E. Richardson, M.D., Dr. Randall performed right shoulder arthroscopic rotator cuff repair, shoulder arthroscopic subacromial decompression/acromioplasty, shoulder arthroscopic biceps tenodesis, shoulder open subpec biceps tenodesis, and shoulder arthroscopic distal clavicle excision on May 5, 2022. (Tr. 322, 468).

In the weeks following surgery, Maurer attended occupational therapy with Courtney Barnett, OT, to rehabilitate her right shoulder. (Tr. 420). On May 9, 2022, Maurer reported that she "over did it" while doing yard work the prior day and was educated on her restrictions. (Tr. 421). Maurer's stated goal at this point was to return to work in four months. (*Id.*). She reported being able to take a sponge bath with shirt and sling remaining on. (*Id.*). OT Barnett provided modifications to assist Maurer in doffing/donning her shirt and in redressing her bandages. (*Id.*). OT Barnett provided a plan of care, recommended for one to three times per week for twelve weeks, depending on insurance limits. (Tr. 423-24). On May 13, 2022, she returned for occupational therapy and endorsed a pain of 2/10. (Tr. 417).

On May 19, 2022, Maurer presented for a 14-day post-operation visit with Jordyn Hatcher, CNP. (Tr. 414). She reported that her shoulder is "doing well overall" and denied any issues or concerns. (*Id.*). The following day, Maurer returned to occupational therapy where again she reported pain at 2/10. (Tr. 412). On May 27, 2022, Maurer reported pain of 1/10. (Tr. 409). On June 10, 2022, Maurer returned to occupational therapy with a sling donned, reporting difficulty sleeping and pain of 2/10. (Tr. 406).

On June 16, 2022, Maurer met with CNP Hatcher for a six week follow up appointment. (Tr. 404). CNP Hatcher reported that "[Maurer] is doing well at this time," and was [p]rogressing well ahead of schedule." (Tr. 405). She recommended transitioning Maurer out of a sling. (*Id.*).

4

Maurer continued to progress well as noted during her four month follow up appointment on September 15, 2022. (Tr. 393). At occupational therapy on the following day, Maurer reported pain of 1/10. (Tr. 401).

On July 1, 2022, Maurer presented for occupational therapy and reported increased bicep tendon pain due to carrying a laundry basket. (Tr. 398). OT Barnett educated her on a one-to-two-pound weight limit. (*Id.*). A week later, on July 8, 2022, Maurer returned to occupational therapy and "report[ed] no pain." (Tr. 395).

On November 15, 2022, Maurer presented to Avita Health Orthopedics for right knee pain. (Tr. 390). Maurer stated that she was walking down a hill and twisted her leg. (*Id.*). The day following the injury, she reported that she could not apply any pressure to her right leg and that chiropractic treatment provided no relief. (*Id.*). On examination, her quad toe was fair, calf was supple and nontender, and McMurray's was mildly positive. (*Id.*). X-ray results revealed mild arthritic changes of the medial compartment, but no fractures, dislocations, subluxations, loose bodies, osteochondral lesions, or any arthritic changes of the lateral compartment or patellofemoral joint. (Tr. 389).

On December 15, 2022, Maurer presented for a seven and a half month follow up with CNP Hatcher. (Tr. 386). Maurer stated her shoulder was doing well, but CNP Hatcher noted the "continued limitations of no more than a couple of pounds with [her] body or above shoulder height due to the size of [the] rotator cuff tear she had." (Tr. 387).

On June 6, 2023, Maurer presented for a 13 month follow up appointment with CNP Hatcher. (Tr. 381). She stated her "shoulder is doing great." (*Id.*). She endorsed occasional shoulder weakness and soreness after work but is "doing well overall." (*Id.*). An examination revealed full range of motion and a supraspinatus strength of 5-/5. (Tr. 382).

Nevertheless, her left knee pain worsened. (Tr. 381). She reported that the steroid injection she received in January 2022 provided relief for approximately one year, but the pain interfered with daily activities. (*Id.*). Maurer also endorsed aching pain, stiffness throughout her knee, and occasional sharp pains that "shoot down her leg." (*Id.*). Examination results revealed a large popliteal cyst, tender with palpation (Baker's cyst), medial joint line tenderness, and positive patellar compression test results. (Tr. 382). After reviewing MRI results from 2019 showing medial meniscus extrusion, mild patellofemoral osteoarthritis, and mild to moderate medial compartment knee osteoarthritis, Maurer elected to receive another intraarticular steroid injection in her left knee. (*Id.*).

Upon referral of CNP Hatcher, Maurer met with Dr. Jeremy Riehm, D.O., on July 6, 2023. (Tr. 375). Maurer reported improvements to her left knee from the injection the month prior. (*Id.*). While posterior swelling had significantly reduced, she reported some contralateral knee pain and swelling at times with a known meniscus tear from the 2019 MRI. (*Id.*). X-rays revealed severe left knee degenerative joint disease, with severe narrowing and spurring. (*Id.*). On examination of her knee, Dr. Riehm noted a moderate Baker' cyst, 5/5 flexion and extension, and a non-antalgic gait. (Tr. 376).

On September 7, 2023, Maurer returned to Dr. Riehm for another left knee injection. (Tr. 369). Although the June 6 injection provided some relief, the pain had worsened, resulting in the need for another injection. (*Id.*). An examination showed a small Baker's cyst, no effusion, no tenderness to palpation, a range of motion of 0-130 degrees, and 5/5 flexion and extension. (Tr. 513).

On February 26, 2024, Dr. Riehm administered another steroid injection to Maurer's left knee. (Tr. 511). Maurer reported constant pain that becomes aggravated from walking stairs,

6

prolonged walking, and standing. (*Id.*). The examination showed a moderate Baker's cyst, no effusion or deformity, no tenderness to palpation, a range of motion of 0-130 degrees, and 5/5 flexion and extension. (Tr. 513).

### C. Medical Opinion Evidence

On November 17, 2022, Jordyn Hatcher, CNP, completed an RFC questionnaire. (Tr. 351). She diagnosed Maurer with rotator cuff repair, right shoulder and asserted a disability date until May 5, 2022. (*Id.*). Maurer could sit, stand, and walk continuously for six hours. (*Id.*). She could lift or carry five pounds continuously for up to six hours per day, two days per week., but never lift or carry 11 or more pounds. (*Id.*). She could bend and squat frequently, but never crawl or climb. (*Id.*). Pain or other symptoms could occasionally interfere with her ability to maintain attention and concentration needed to perform simple work tasks. (*Id.*). She would not be absent from work for any days as a result of her impairments. (*Id.*).

On March 2, 2023, state agency consultant Dr. James Gatton, M.D., conducted a consultative physical examination. (Tr. 358). Dr. Gatton noted right shoulder strength of 4/5 for flexion, extension, abduction, external rotation, and internal rotation. (Tr. 353). Maurer was unable to hop or squat. (Tr. 359). He opined that Maurer could walk and be on her feet for four to five hours out of an eight-hour day. (*Id.*). She could carry less than 10 pounds frequently and occasionally carry more than 20 pounds. (*Id.*). Dr. Gatton noted general limitations with her right arm, including lifting, carrying, pushing am pulling. (*Id.*). Finally, he opined that crawling, kneeling, crouching, climbing, stooping, and bending would "be difficult." (*Id.*).

On June 28, 2023, state agency consulting physician Dr. Lawrence Landwehr, M.D., conducted a functional capacity examination. (Tr. 361-68). Dr. Landwehr opined that Maurer could lift and/or carry 20 pounds occasionally and 10 pounds frequently. (Tr. 362). She was not

7

limited in her ability to push and/or pull. (*Id.*). She could sit, stand, and/or walk with normal breaks for six hours in an eight-hour workday. (*Id.*). Maurer could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; and occasionally stoop, kneel crouch, and crawl. (Tr. 363). She could frequently reach in all directions with her right shoulder and lacked any limitations regarding handling and fingering. (Tr. 364).

On July 1, 2023, state agency reviewing physician Dr. Gary Hinzman, M.D., reviewed Maurer's file at the initial level. (Tr. 61). Dr. Hinzman opined that Maurer lift and/or carry 20 pounds occasionally and 10 pounds frequently. (Tr. 65). She could sit, stand, and/or walk with normal breaks for six hours in an eight-hour workday. (Tr. 66). She could frequently push or pull with her right shoulder. (*Id.*). She could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.*). He further determined that she could occasionally balance, stoop, kneel, and crawl, but never crouch. (*Id.*). She could frequently reach in front and laterally, frequently reach overhead, and frequently handle with her right arm. (*Id.*). On October 8, 2023, state agency reviewing physician Leon Hughes, M.D., affirmed these findings at the reconsideration level. (Tr. 74-75).

### D. Administrative Hearing Evidence

Maurer testified at a hearing before the ALJ on April 8, 2024. (Tr. 34). At that time, Maurer was 5′7″ and weighed 145 pounds. (Tr. 39). She lived in a house with her husband. (Tr. 40). She is right-handed and completed the 12th grade. (Tr. 39, 40). Maurer has a driver's license, and stated driving was "doable, but . . . prior to a year after the surgery [*sic*]—it wasn't that good." (Tr. 40).

Maurer stated that she was currently working as a bartender, which she had done for the past 12 years at different locations, but with generally the same physical demands. (Tr. 41). The

8

job required her to lift approximately 50 pounds and to be on her feet during her shifts. (Tr. 43-44). Maurer stopped working on April 28, 2022, shortly before her shoulder surgery, until November 2022. (Tr. 41). Upon her return, she was limited to work only two days a week on the lunch shift because those shifts were not as busy and reported issues with performing her duties such as dropping plates. (Tr. 41, 47).

When asked about her typical day post-surgery, Maurer testified that she was "babying [her] arm quite a bit because it was pretty painful after working the few days." (Tr. 45). She stated that she did household chores but was very careful with her shoulder because her surgeon said it "looked like an 80-year-old man's[.]" (*Id.*). She also required assistance from her husband to get dressed. (*Id.*).

Maurer further reported that around a year after her surgery, she struggled to hold any weight with her right arm while it was fully extended. (Tr. 45-46). She testified that she generally relied on her left arm more and even used her left arm to lift her right arm up to compensate its limitations. (Tr. 46). Depending on the level of arm extension, she claimed that she could lift a maximum of five pounds. (Tr. 47). However, she reported no issues with manipulation so long she did not lift her arm. (*Id.*).

The ALJ next asked about Maurer's knee pain. (Tr. 47-48). She testified that until she received cortisone injections, she could not apply any pressure on her knee in late 2022. (Tr. 48). She stated that the injections "helped tremendously" and the pain is "nothing [she] can't handle." (*Id.*) Finally, Maurer and the ALJ discussed her mental health and substance abuse history. (Tr. 49). She testified that she no longer uses drugs, but does suffer from depression. (*Id.*).

When questioned by her attorney, Maurer stated that during the alleged disability period, there was "no way" she could have used her right arm six to eight hours per day for five days a

9

week or lift ten pounds. (Tr. 51-52). She noted that during this period, she struggled with certain outdoor household tasks such as mowing the lawn and tending to her flowerbeds because of the pressure on her right shoulder. (Tr. 52).

Following Maurer's testimony, the VE testified and classified Maurer's work as bartender, DOT 311.411-018, SVP 4, semi-skilled, physical demand level light, performed at medium. (Tr. 55). The ALJ provided the following hypothetical: an individual with the same age, education and work experience as Maurer who could perform light work; frequently push and/or pull with the right upper extremity; frequently push and/or pull with the left lower extremity; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; but cannot crawl or climb ladders, ropes, or scaffolds; frequently reach with the dominate right upper extremity in all directions; no limitation in reaching with the left upper extremity; have no exposure to unprotected heights or moving mechanical parts; and could not perform commercial driving. (Tr. 55). The VE testified that the hypothetical individual could perform Mauer's past work as a bartender as classified per DOT, but not as performed by Maurer. (Tr. 56).

At the light physical demand level, this hypothetical individual could also perform the jobs of: (1) merchandise marketer, DOT 209.587-034, SVP 2, unskilled, with 137,000 jobs in the national economy; (2) routing clerk, DOT 222.687-022, SVP 2, unskilled, with 118,000 jobs in the national economy; and (3) sales attendant, DOT 299.677-012, SVP 2, unskilled, with 174,000 jobs in the national economy. (*Id.*).

The ALJ presented a second hypothetical individual with the same limitations identified in the first hypothetical, except instead of frequently reaching with the upper right extremity, the second individual can only occasionally reach in all directions. (*Id.*). The VE testified that there

were not any jobs available in the national economy due to the reduction to occasional reaching. (Tr. 55-56).

Finally, the ALJ presented a third hypothetical individual with the same limitations as the first hypothetical, including the light work limitation, or at least the standing, walking, and sitting limitations of light work, but can only lift and/or carry ten pounds occasionally and frequently. (Tr. 57). The VE noted that the jobs she previously presented would be eliminated and no light exertional jobs exist for the hypothetical. (*Id.*).

## IV. The ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2. The claimant has not engaged in substantial gainful activity since April 27, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: bilateral knee osteoarthritis; right should degenerative joint disease, status post arthroscopy (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently push/pull with the right upper extremity; frequently push/pull with the left lower extremity; occasionally climb ramps/stairs, balance (as defined in the SCO), stoop, kneel, crouch; Never crawl; Never climb ladders/ropes/scaffolds; Frequently reach with the dominant right upper extremity; No exposure to unprotected heights, moving mechanical parts; No commercial driving.

6. The claimant is capable of performing past relevant work as a bartender. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 27, 2022, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 19-27).

**V.      Law & Analysis**

    **A.      Standard for Disability**

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

    **B.      Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the

Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI.     Discussion**

Although written as a single issue in her Brief on the Merits, Maurer appears to raise two distinct issues for review:

1. Did the ALJ err in his evaluation of Jordyn Hatcher, CNP, by failing to compare her opinion with the supportive explanations provided in the treatment notes?

2. Did the ALJ err by rejecting the closed period of alleged disability?

(ECF Doc. 8, p. 1).

As to the second issue, the ALJ denied the requested closed period of disability, finding Maurer not disabled from April 28, 2022, through the date of the decision on April 24, 2024. (Tr. 17). Maurer makes no detailed argument in her brief regarding this issue. (*See generally* ECF Doc. 8). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal citations omitted). Absent further explanation of the ALJ's alleged error, I deem Maurer has waived this argument.

Nevertheless, I note that the ALJ considered evidence within the alleged 12-month period in reaching his disability determination in Maurer's case. The ALJ cited to Dr. Gatton's examination records and opinion from March 2023—eleven months after the alleged onset—and progress notes from treating physicians during post-surgical recovery in the months following Maurer's shoulder surgery. (Tr. 25). To qualify for disability, the claimant must satisfy the durational requirement of an impairment "which has lasted or can be expected to last for a continuous period of at least 12 months." *See* SSR 23-1p, 2023 WL 8236247 at *2. Having reviewed the ALJ's decision, I do not find error in his consideration of the durational period when he rejected the alleged closed period of disability.

14

Notwithstanding, Maurer argues that the ALJ did not properly evaluate the opinion of Jordyn Hatcher, CNP, alleging failure to compare her opinion to treatment notes, and that the ALJ's opinion lacked an adequate analysis regarding supportability and consistency. (ECF Doc. 8, p. 10). Specifically, she argues that "[t]he ALJ failed to identify evidence inconsistent with CNP Hatcher's opinion, and the ALJ failed to accurately cite to the post-surgical orthopedic records indicating that [her] limitations were primarily preventative due to the severity of the tear in her shoulder." (*Id.*). She later states "the ALJ provided multiple reasons for discounting the persuasiveness afforded to the opinion of CNP Hatcher, including [her] ultimate recovery after surgery, and most of the reasons are conclusory and not tied to evidence [in] the record." (ECF Doc. 8, p. 13).

Under 20 C.F.R. § 404.1520(e), the Administrative Law Judge (ALJ) assesses a claimant's Residual Functional Capacity (RFC) based on all medical and other relevant evidence in the record. In doing so, the ALJ must explain how medical opinions and prior administrative medical findings were considered. *See* 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ is required to address two key factors when evaluating medical opinions: supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). Other factors generally do not need to be discussed. *Id.*

Consistency refers to how well a medical opinion aligns with other evidence in the record as a whole. *See* 20 C.F.R. § 404.1520c(c)(1)-(2). The more consistent an opinion is with this evidence, the more persuasive it will be. Supportability concerns how well the medical opinion is backed by relevant objective medical evidence and the medical source's own explanations. The stronger this support, the more persuasive the opinion. *Id.*

15

"Although the ALJ may not substitute his opinion for that of a physician[,]" the ALJ "is not required to recite the medical opinion of a physician verbatim in his finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(3)).The ALJ must only "articulate how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R 416.920; *Gamble v Berryhill*, No. 5:16-CV-2896, 2018 WL 1080916, at *5 (N.D. Ohio, Feb. 28, 2018). An ALJ is not required to explain every piece of evidence in the record, but "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Bayes v. Comm'r of Soc. Sec.*, 757 F. App'x 436, 445 (6th Cir. 2018).

Here, the ALJ found the opinions of Jordyn Hatcher, CNP, not persuasive. (Tr. 25). He noted that the opinions were restricted to May 5, 2023, one year after Maurer's surgery, but were offered in November of 2022, without reference to Maurer's significant postsurgical recovery and progress. (*Id.*). In support of his conclusion, the ALJ expressly stated why he found CNP Hatcher's opinions unsupported and inconsistent with evidence in the record. (*Id.*).

Regarding supportability, the ALJ explained that CNP Hatcher's opinion of Maurer's functional capaicty lacked "any significant supporting rationale, only noting the claimant's prior surgery." (*Id.*). Specifically, the ALJ stated that "[o]pinions that the claimant could never climb are unsupported by any physical findings [], as the only noted impairment was the claimant's shoulder[,]" and "opinions [that] the claimant could only work 2 days per week for 6 hours, for a year after her surgery is not supported by any objective findings[.]" (*Id.*). Maurer argues that "the ALJ failed to consider the content of the treatment notes of CNP Hatcher during the closed period of alleged disability, including objective findings and why [Maurer] has limitations[.]" (ECF Doc. 8, p. 12). However, the Commissioner correctly notes that "the ALJ's decision is

16

supported by substantial evidence, as the opinion itself contained almost no explanation or objective evidence." (ECF Doc. 10, p. 7). For example, in her RFC examination, CNP Hatcher opined that Maurer was restricted to six hours of continuously sitting, standing, or walking and could not continuously lift or carry five pounds. (Tr. 351). In contrast, CNP Hatcher's treatment notes demonstrate significant post-surgical recovery. While Maurer reported occasional right arm pain and CNP Hatcher instructed her of her limitations, she consistently denied any other issues or concerns. (*See* Tr. 393, 404, 415). The ALJ acknowledged this evidence and weighed it accordingly. (*See* Tr. 22 ("She was advised to continue no more than a few pounds with the right upper extremity. She was advised to use Tylenol for pain and continue exercises at home.")).

Additionally, Maurer argues that the ALJ omitted from his opinion certain evidence in the record that undermined his conclusion and could have supported a different finding regarding the severity of her symptoms. (*Id.* at pp. 13-16). In support of her position, Maurer offers evidence from the record she argues supports her case, but in substance, this amounts to asking this Court to reweigh the evidence in her favor. Such an exercise is beyond the scope of this Court's review, as I cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *See Jones*, 336 F.3d at 476. So long as substantial evidence supports the Commissioner's decision this Court will not reverse "even if there is substantial evidence in the record that would have supported the opposite conclusion" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). As a result, I find the record comports with the ALJ's finding that CNP Hatcher's opinion lacked sufficient supporting rationale.

With respect to consistency, the ALJ noted that CNP Hatcher's opinion about lifting limitations was inconsistent with Maurer's own reports and examinations around the required one-year durational requirements, citing to relevant portions of the medical record. (Tr. 25). He

then noted that "opinions that the claimant's symptoms would interfere with attention and concentration[] are wholly unsupported and inconsistent with the claimant's own recovery[,] rating her pain as only 1-2/10 (Exhibit 7F)." (*Id.*). Maurer argues that "the ALJ only compared CNP Hatcher's opinion to her own treatment notes." (ECF Doc. 8, p. 17). This argument, however, fails to take into account the substance of the record upon which the ALJ relied in his decision.

In a portion of the record cited by the ALJ, Dr. Gatton opined that Maurer could carry less than 10 pounds frequently and more than 20 pounds on occasion as opposed to CNP Hatcher's opinion that Maurer was limited to five pounds. (Tr. 359). Moreover, occupational therapy progress notes reveal continuous progress throughout postsurgical recovery. Although shortly after her surgery Maurer reported difficulty sleeping (*see* Tr. 406) and increased bicep tendon pain due to carrying a laundry basket on one occasion (*see* Tr. 398), Maurer consistently reported pain on a scale of 1-2/10 or no pain at all. (Tr. 395, 401, 406). Other progress notes show that Maurer reported that knee pain worsened over time, but the injections "provided good relief in the past." (Tr. 369). As such, I find that the ALJ's analysis of the consistency factor is supported by substantial evidence in the record. *Rogers*, 486 F.3d at 241, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In sum, I find that the ALJ properly "articulate[d] how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions[,]" and therefore built a logical bridge supported by substantial evidence that allows this Court to follow his reasoning. 20 C.F.R 416.920; *Gamble*, 2018 WL 1080916, at *5; *Bowen,* 478 F.3d at 749. Consequently, I must recommend leaving the Commissioner's decision undisturbed.

**VII.     Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Maurer's application for DIB be affirmed.

Dated: November 20, 2025

                                                                    Reuben J. Sheperd
                                                                     United States Magistrate Judge

---

**OBJECTIONS**

**<u>Objections, Review, and Appeal</u>**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).